Paul B. NUNN, et al., Plaintiffs,

v.

CHEMICAL WASTE MANAGEMENT, INC., et al., Defendants.

No. 82–1845–K.

United States District Court, D. Kansas.

Feb. 22, 1988.

Order on Motion to Reconsider March 18, 1988.

Thomas A. Wood, H.E. Jones, William R. Smith, Hershberger, Patterson, Jones & Roth, Wichita, Kan., for plaintiffs.

Robert Driscoll, Lawrence M. Berkowitz, Paul E. Donnelly, Stinson, Mag & Fizzell, Kansas City, Mo., and William Tinker, Sr., McDonald, Tinker, Skaer, Quinn & Herrington, P.A., Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This case, in part, involves the ramifications from the purchase and sale of all of the stock of National Industrial Environmental Services, Inc. (NIES), a company that owned and operated a hazardous waste treatment and disposal facility approximately 10 miles northeast of Wichita, Kansas, near the community of Furley, Kansas. The stock of NIES was sold by the plaintiffs and counterclaim defendants, Gene Miles, Paul B. Nunn, and John S. Hoover, to defendant and counterclaim plaintiff, Chemical Waste Management, Inc., on December 15, 1980, pursuant to the terms of a written agreement executed by the parties on May 14, 1980. Chemical Waste is a wholly-owned subsidiary of Waste Management, Inc.

Plaintiffs brought suit here to enforce the terms of a promissory note which had been given by Chemical Waste and guaranteed by Waste Management as consideration, in addition to a $500,000.00 cash payment, for the purchase of plaintiffs' stock in NIES. At the time of trial, there remained an unpaid principal balance on the promissory note of $2,025,000.00, together with interest. Defendants claimed that enforcement of the note was precluded because of a failure of consideration and/or the application of the principles of promissory estoppel. Defendants counterclaimed against all of the plaintiffs, asserting a breach of contractual warranties in the sale of plaintiffs' NIES stock to Chemical Waste; they counterclaimed against plaintiff Miles asserting negligent design, construction and operation of the NIES hazardous waste facility; and counterclaimed

against defendants Miles and Nunn pursuant to the provisions of 42 U.S.C. § 9607, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA). Defendants sought reimbursement for lost profits, costs of remediation resulting from the January 18, 1982 closure of the NIES facilities by the State of Kansas for polluting the waters of Kansas, and for declaratory judgment adjudicating the plaintiffs' liability to pay for defendants' future losses.

Following full trial, I announced certain findings of fact and conclusions of law and entered judgment accordingly. My findings were formalized by an order of March 7, 1985. Both parties appealed the opinion of this court to the Tenth Circuit Court of Appeals. While not privy to their respective briefs, plaintiffs, Miles, Nunn and Hoover, seemingly complained of the court's findings of joint and several liability, and defendants Chemical Waste and Waste Management seemingly complained that while I found CERCLA provisions to have been violated, the act in this instance was found to have no retroactive application. In this regard, by order of August 21, 1987, the Tenth Circuit Court of Appeals remanded the matter, determining that the CERCLA issue is an essential element of the appeal and that somehow other deficiency problems exist, including the handling of the promissory note given to plaintiffs with a balance of something over $2 million in what the Circuit suggests as purely an action for damages. The remand is to resolve the joint and several liability issues as well as the separate entity issue as to the corporation NIES, the subsidiary of defendants which operated the facility after the stock sale.

After reviewing the order and judgment of the Tenth Circuit Court of Appeals, I communicated with counsel, requesting their suggestions as to how we might proceed. I have expressed to them my problems here, as the case is returned as if "prologue". To be sure, I expressed uncertainties as to just what each had claimed before the Circuit. By example, I was surprised to hear of defendants' cross-appeal on the CERCLA issue. Here, the issue raised by amendment was considered entirely secondary, if not irrelevant, to the substantive claims, wherein defendants have fully prevailed. Some time ago I was apprised that plaintiff Miles had paid in

approximately $1 million to buy his peace here, and plaintiff Hoover, a mere bookkeeper with limited interest, was to be dismissed. It struck me that the defendants' position arises more out of principal than practicality. In every event, I requested the filing of the litigants' respective suggested findings and briefs.

Counsel have now responded. In substance, the plaintiffs urge that I adopt a host of previously filed findings of fact and enter conclusions of law as set forth in previously filed suggested conclusions of law. They urge that the separate entity issue resulting from the operation of the facility by NIES after the stock sale was not addressed by me, but that the issue was explicitly addressed by the plaintiffs in their previously suggested findings of fact and conclusions of law. With respect to the CERCLA issue, plaintiffs believe that I should take a multi-level approach, the thrust of which is to reconsider having permitted defendants leave to amend to assert the CERCLA claim in the first instance. (While the latter proposal is tempting, it hardly suffices the Tenth Circuit's mandate.)

Defendants are more adamant, in that they insist CERCLA's provisions were retroactive, and thus the CERCLA claim should be addressed on its merits.

■ I have carefully reviewed the respective proposals. Additionally, I have returned to a massive file and have reviewed it as well. Now being reasonably refreshed on the matter, I disagree with both. Essentially, my rulings from the bench served to clarify, at least in my own mind, the reasons for all of my findings and rulings, which are far more complete than those set forth in the formalized order of March 7, 1985. In great measure, I am satisfied that these findings suffice much of the Circuit's understandable concern. I will address the former issues first, in that I said then, in part, as follows:

Now, with that said, for the purpose of decision, I find as follows:

At the time of the close of the sale, that is to say December 15, 1980, the waste disposal site, then operated by NIES, Inc., was leaking chemical and acidic waste contaminants; that these contaminants had already meandered off-site and these contaminants did migrate northeasterly in the A-zone and probably at latter stages had merged with the B-zone and found their way to the Prairie Creek areas.

That as a consequence of the initial findings, they were sufficient to suggest an incident of pollution, and the State of Kansas was duly authorized to order a shut down on the operation and to cancel the permit and to order alteration, which is a remedial repair.

I find that this event—that is, the leakage—is directly related to the fact that since inception of the operation by NIES, their employees have negligently dumped regularly and continuously sufficient and significant quantums of chemical and acidic wastes having pH levels of point five or thereabouts into the treatment and/or evaporation ponds. The undisputed chemical effect of this evidence is that, as they were unneutralized at the time of dumping, the exposure of these acids to the carbonate nodules found in the clay content of the sides and the walls gave rise to an immediate and disruptive reaction, and in the course of time, given the continuous weight of the liquid wastes within the tanks, it reasonably follows that this waste found its way horizontally and/or vertically to the A-zone, this zone lies within fifty to sixty feet below or in reasonable proximity of the bottom of these ponds.

Once having invaded this porous zone, the chemicals and hazardous wastes found its way to the springs and perhaps elsewhere as it migrated in a northeasterly direction.

I'm not a hydrologist or geochemist, but Defendant's Exhibit 223, which capsules these findings, as far as I'm concerned from a technical standpoint says it all as to the very findings I have made.

This evidence also suggests and supports the time frame for this occurrence. As this reaction was immediate from the first dumping, it clearly preceded Decem-

ber of 1980, and probably from the outset—that is, in February of 1977, being the time of its first dumping. The formulas for this velocity and the time tables are graphically shown in Exhibits 379, 380 which have been helpful in understanding this time frame.

As indicated, these findings are wholly sufficient to require the state to act precisely as they did, by any standard, the extent of this leak, the source of the leak clearly violated all of the applicable authority pertaining to storage, maintenance and operation of a waste disposal site and the terms of the permit.

It follows that as a consequence of these findings, the terms and conditions of the NIES permit were in violation of it as of December 15, 1980, and on notice was deserving of cancellation.

Next, with these findings made and understood, I want to deal with the effect as regards to the plaintiffs' claim and the defendants' defenses and counterclaims.

In the Court's view, the foregoing findings that I have just resumed are all that is necessary for the following:

The plaintiffs' claim for recovery on its note is wholly without merit and it is a nullity. There is simply no consideration intended nor extended for such a setting. The Waste Management Company indeed bought a pig in a poke, and those are not my words, those are the words of the state as shown in Defendant's 227, but say it all so far as I can see.

The defendants should not nor will they be held for satisfaction of any portion of the note and the plaintiffs' claim is dismissed.

With that said I needn't discuss the aspects of estoppel.

As to the defendants' counterclaim, there are some secondary issues. The plaintiff claims personal liabilities, at least Mr. Miles, for negligence in the exercise of whatever conduct was undertaken by him from the outset, and which includes site selection and consultant, selection and approval of specifications, overseeing of construction, the selection of collector sources and the operation of the unit. It would appear to me that whatever the conduct, at all times material herein Mr. Miles was always acting within the scope of his corporate office and within his corporate capacity. His acts were the acts of the corporation and he's not personally accountable for such conduct, and that claim is dismissed.

(Tr., pp. 3–6.)

I said further:

Essentially then we deal here with a simple breach of contract case and principally as it relates to the parties' respective warranties. I say simple as the lawyers and the litigants have somehow attempted to suggest complexity with regard to the parties' intentions and what this contract says. As I would understand it this contract is not ambiguous, not ambiguous in the sense the terms of the agreement can be taken several ways.

In the Court's view the terms and the parties['] intentions are clear: NIES, Inc. owned and developed the waste disposal site. The defendants wanted to buy it and were willing to pay a premium in the amount of two million nine hundred thousand dollars. The sellers, being the plaintiffs individually, represent the operation is in full compliance with all applicable laws and the permit so declares. In all probability, the plaintiffs had good reason to believe this in the absence of actual knowledge that the site was, in fact, leaking at the time they made these various representations.

They strike a deal, the stock is assigned, pertinent assets are set over, possession taken, and the buyer, being Waste Management, is underway. Now the leak is discovered, and to which the sellers say: Too bad. We never warranted that the site wasn't leaking! We are in good faith and somehow relieved of the very responsibilities they would have been required to make had there been no sale.

In this regard, it is the Court's finding that the warranties of the agreement to the effect that at all times material here-

in that the site, the state of construction, the operation is in full compliance with all laws applicable thereto and with the permit in conjunction therewith, clearly and logically implies that, as a matter of fact, at the time of the sale it is warranted that the site was not leaking; it is warranted that it has not leaked or escaped its container; it has warranted that it was not meandering off-site.

While they represent the site is in compliance with the permit, as a matter of fact, it was not, thus these warranties are breached. With that said, I'm convinced that no one in this case ever remotely assumed any fact to be the contrary. This entire transaction presupposes that the site was not leaking, had not leaked, was clearly operational and in full compliance with the terms of its permit, and any suggestion to the contrary now, however well intended, is simply that of someone grasping at straws, and it is, in the Court's view, a wholly unreasonable posture for one to seriously suggest it here.

Thus it is my finding that the terms and conditions of the agreement, including those warranties here addressed, were breached by the plaintiff from the outset in that on the date of closure, December 15, 1980, the waste site was leaking waste contaminants to the extent found, all in violation of the NIES permit.

Now, with regard to the effect of this breach: Waste Management reasonably contemplated the enjoyment of profits from its operation of the site. It did experience a reasonably successful operation through the date of closure, but as of that time has lost those profits reasonably contemplated through that day, and in all probability any future profits from this operation are forever lost.

I listened to the evidence of those who came on for the defendant. The evidence is that the loss sustained to date is shown to be in the amount of one million seven hundred and ten thousand four hundred and four dollars as of August of 1984, and that is Exhibit 490 of the defendant. Judgment will enter against the plaintiffs in their individual capacity, jointly and severally, *signators, warrantors and indemnitors* under the agreement in this amount with interest applicable as of today.

Next the costs advanced as a consequence of the state's order for remediation. These would logically include the costs of those expenditures attendant and outlined in the evidence. I have listened to those witnesses and I have studied these exhibits and I have heard the plaintiffs' comments. They appear to be reasonable and necessary expenditures and in my view not seriously controverted. These expenditures are found to be in the amount of six million nine hundred and sixty-four thousand nine hundred and forty-two dollars and twelve cents as supported in Defendant's Exhibit 483, and have been paid or reassigned and satisfied within the framework of the Waste Management Company. Accordingly, judgment will similarly be entered this date against the plaintiffs in their individual capacities in this amount. (Tr., pp. 7–10; emphasis added.)

Hopefully, the foregoing suffices the Circuit's concern as to why the plaintiffs' claim on the note was dismissed and joint and several liability of the individual plaintiffs and NIES runs here.

Next, the separate entity issue as to NIES, a subsidiary of defendants which briefly operated the facility in that capacity, as licensee, after the stock sale. I presume this issue is framed by the Circuit Panel because the plaintiffs are now suggesting that if they, as guarantors and former stockholders of NIES, are liable, then NIES is to share the fault for whatever occurred after the sale. If this is a correct analysis of the issue, the Circuit Panel's interest is well placed. However, if such an issue was raised here, I missed it, as such a posture is redundant to that which was before me and in my view is misleading. In the interest of clarity, however, I find now as I found then, that the sole cause of the polluted state of the Furley waste site was at the hands of plaintiffs, as they operated the site in its corpo-

rate capacity, and that by the time of the sale the damage was already done, and nothing undertaken by NIES or these defendants after the sale remotely contributed to the event.

 As to the CERCLA matter, I stated in part as follows:

Next the CERCLA claims. This act clearly provides the kind of guidelines, regulatory language and other requisites necessary for the engagement of any form of waste disposal units in today's society, they are visionary, realistic and timely. There is no question that if, in effect, in 1976, coupled with the application of other new laws and standards, this incident probably could not have occurred.

The changes in our laws and the contents of the environmental protection and pollution control in this short time frame are quite dramatic.

With that said, and while the act contemplated from the study and even some rules were drafted in 1980, the provisions in my view are not applicable here. Whatever sanctions, requisites and remedies that are contemplated in the act are not retrospective and the provisions are not applicable here as a basis for relief for those claims, and those claims are also dismissed.

(Tr., pp. 6–7.)

Now, of course, the CERCLA provisions and remedies have retroactive application, and I need no authority, recently attained, to tell me this, nor did I need it then. To be sure, the concerns of the United States, doubtless expressed in its amicus curiae briefs, are entirely understandable. Given the circumstances, enforcement officials of the Environmental Protection Agency ought to be permitted to move in now and take care to clean up hazardous waste wherever it is found, and to impose upon the wrongdoers whatever sanctions, wherever found, notwithstanding whenever it occurred!

In this case, the act came into play two days before the contract was signed. The plaintiffs' individual and corporate acts, which gave rise to the pollution of the Furley waste site precede its enactment by at least four years. At the time of decision, it occurred to me that while the provisions of the act are violated, as I so found, the plaintiffs hardly contemplated violation of a federal act not then in existence. My reasons, however, were more than that. At the time this case was taken up, the state had already moved in and had already put in place all that CERCLA remedies provide. Full clean-up was under way and the costs were assessed. Defendants were in full compliance with those requisites, and their damages were known. The CERCLA remedies could do no more than this; moreover, and to my knowledge, as of then the EPA officials were still on the sidelines, seemingly satisfied with the state's actions and not involved in any way. Principally, for this reason I thought the CERCLA claims were irrelevant here, as the defendants' award simply served to indemnify them against the plaintiffs, given the latters' causitive involvement.

Lastly, I was concerned with regard to plaintiffs' plight, given the circumstances. As stated additionally at the time I entered my findings, I said in part as follows:

But before I comment on that aspect of it, I think it's best to note that I'm the first to know that these judgments against these individuals appear harsh, certainly in light of the substantive nature of the sums, and particularly as they run to individual signators under the agreement. They probably will create severe hardships, if not ruinous to their individual financial capacities, and these findings have not been taken lightly but solely as a consequence of the facts of the matter and with the firm conviction that the findings are the correct ones and the only ones the Court can make.

I'm also convinced, however, and I think it's proper to state that should there have been no sale here or one have every [sic] been contemplated, the same plight undertaken by Waste Management would have been that of their's to deal with. Regrettably as of then the corporate structure, that is NIES, Inc.,

would have been the target for shutdown, remedial cost, lost profits or whatever, and all of those responded to and expended are lost, now by Waste Chemical. Additionally, they and not Waste Management would be the victims for purported sanctions, fines or threats of each and they would be the litigants responding to numerous claims for damages.

(Tr., p. 11.)

I deliberately recited and articulated my findings and conclusions from the bench because I wanted the litigants to understand my findings and their reasons, and to put in place a remedy for the defendants that was reasonable and which should be satisfied, given the evidence. These were my reasons for the rulings, ever satisfied that all parties had their day, all issues resolved, and the case in place for ready disposition. I entered orders which in my view were just, fair and equitable, given the circumstances that related to the entire event.

Hopefully, the foregoing suffices the mandate of the Tenth Circuit, and on the strength of which the matter can be returned and reviewed for full and final opinion.

IT IS ACCORDINGLY ORDERED this 22 day of February, 1988, that the Clerk of the Court forward copies of this opinion to the Clerk of the Tenth Circuit Court of Appeals, under the following case captions:

Case No. 85–1509

Paul B. Nunn, Gene Miles and John S. Hoover,

Plaintiffs–Appellants,

vs.

Chemical Waste Management, Inc., a Delaware Corporation; and Waste Management, Inc., a Delaware Corporation,

Defendants–Appellees,

United States of America,

Amicus Curiae.

Case No. 85–1570

Paul B. Nunn, Gene Miles and John S. Hoover,

Plaintiffs–Appellees,

vs.

Chemical Waste Management, Inc., a Delaware Corporation; and Waste Management, Inc., a Delaware Corporation,

Defendants–Counterclaimants–Appellants,

United States of America,

Amicus Curiae.

## MEMORANDUM ORDER

### ON MOTION TO RECONSIDER

On August 21, 1987, the Tenth Circuit Court of Appeals remanded this matter with certain directives. Consistent therewith, I reviewed the respective litigants' requested briefs, and reviewed my file. On February 22, 1988, I entered a memorandum and order which, in my view, complied with the mandate.

Now, plaintiff has moved to reconsider, alter, or amend my order, suggesting that I failed to comply with the mandate and urging additional findings. Defendants have responded, seemingly agreeing with my findings but suggesting that I reconsider them to the extent of entering certain CERCLA findings proposed by defendants.

Both of the requests are denied, in that I am satisfied that I have substantively addressed the issues raised by the Tenth Circuit. Indeed, if I have not, the panel can and will again express itself. Moreover, now having redelivered this file to the Tenth Circuit Court of Appeals, the matter is in its hands and I am without jurisdiction to hear or consider the case further.